IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARCEL NICOLE INGRAM,** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**THE HONORABLE GEORGE** )<br>**DUNBAR, in his individual capacity, THE** )<br>**HONORABLE ERIC DAVANZO, in his** )<br>**individual capacity, JACOB SMELTZ, in his** )<br>**individual capacity, JORDAN GOUKER, in his** )<br>**individual capacity, WILLIAM SCHALLER,** )<br>**in his individual capacity, LISA ZAUCHA, in** )<br>**her individual capacity, ALICIA MCGHEE, in** )<br>**her individual capacity, JILL VECCHIO, ESQ.,** )<br>**in her  individual capacity; and CANDICE** )<br>**MITCHELL, in her individual capacity,** )<br>)<br>**Defendants.** ) | NO. 2:22-cv-1594 |

## FIRST AMENDED COMPLAINT

### I. PRELIMINARY STATEMENT

Plaintiff, Marcel Nicole Ingram, seeks lost wages and benefits, compensatory and punitive damages, costs, and attorney's fees because Defendants, acting under color of state law, deprived her of her rights under the First Amendment to the United States Constitution when they terminated her employment in retaliation for her constitutionally protected free speech, in violation of 42 U.S.C. § 1983.  Plaintiff also seeks lost wages and benefits, actual damages, costs, and attorney's fees because Defendants terminated her employment in retaliation for her good faith reports of wrongdoing, in violation of the Pennsylvania Whistleblower Law, 43 P.S. § 1423(a).

### II. JURISDICTION

1. This Court has jurisdiction of this matter by virtue of 28 U.S.C. § 1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

1

2. This Court also has jurisdiction of this matter under 28 U.S.C. § 1367, in that this is a civil action of which this Court has original jurisdiction, and one of Plaintiff's claims is brought under Pennsylvania state law, which is related to the federal claim in this action in that they form part of the same case or controversy under Article III of the Constitution of the United States.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a civil action in which jurisdiction is not founded solely on diversity of citizenship, and the acts constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

### III.     PARTIES

1. Plaintiff, Marcel Nicole Ingram, is an adult individual residing at 125 Supervisors Drive, West Newton, PA 15089.  At the time of the incidents complained of in this lawsuit and presently, she was and is a citizen of the Commonwealth of Pennsylvania and the United States of America.

2. Defendant the Honorable George Dunbar ("Rep. Dunbar") serves as a Pennsylvania State Representative in the Pennsylvania House of Representatives and has an office located at the Pennsylvania State Capitol Complex, 501 N 3rd Street, Harrisburg, PA 17120.

3. Defendant the Honorable Eric Davanzo ("Rep. Davanzo") serves as a Pennsylvania State Representative in the Pennsylvania House of Representatives and has an office located at the Pennsylvania State Capitol Complex, 501 N 3rd Street, Harrisburg, PA 17120.

4. Defendant Jacob Smeltz serves as the Chief of Staff to the Speaker of the Pennsylvania House of Representatives.

5. Defendant Jordan Gouker serves as the Director of Operations and Financial Management for the Pennsylvania House Republican Caucus ("HRC").

6. Defendant William Schaller serves as the District Operations Director for the HRC.

7. Defendant Lisa Zaucha serves as the Southwest Regional Coordinator of District Operations for the HRC.

8. Defendant Alicia McGhee serves as a Regional Coordinator for the HRC.

9. Defendant Jill Vecchio, Esq. serves as the Deputy Chief Counsel for the HRC.

10. Defendant Candice Mitchell serves as an Executive Assistant for the HRC.

### IV. STATEMENT OF CLAIM

11. In March 2020, the HRC assigned Ms. Ingram to serve as Rep. Davanzo's District Office Manager.

12. Although given that job title, Rep Davanzo and Defendant's management referred to Ms. Ingram as his Chief of Staff.

13. Ms. Ingram worked at Rep. Davanzo's district office, located at 119 N. Water Street, West Newton, PA 15089 ("District Office").

14. The District Office is open to the public, and constituents frequently stop by for assistance on a range of matters.

15. In the beginning of May 2022, Ms. Ingram and Fallyn Weightman, Legislative Aide, began sporadically smelling strong, foul odors while working in the District Office.

16. The odors became so intense that they burned Ms. Ingram's and Ms. Weightman's eyes, and both began developing headaches when the odors were present.

17. In a May 5, 2022, text message exchange (attached as Exhibit A) between Rep. Davanzo, Ms. Ingram, and Ms. Weightman, Ms. Ingram reported that the odors were causing their eyes to burn.

18. In response, Rep. Davanzo speculated that the District Office's neighbor was the source of the odors.

19. He did not address his staff's concerns about their burning eyes.

20. Ms. Ingram raised the odor issues with Rep. Davanzo several more times, including the resulting headaches, and he repeatedly referred her to the District Office's landlord.

21. Following his advice, Ms. Ingram made multiple complaints to Joyce Pawlik, the District Office's landlord, regarding the odors.

22. Despite her complaints, the odors continued to reappear, and Ms. Pawlik claimed to be unable to locate the source of them.

23. On June 3, 2022, Ms. Ingram reported the following to Ms. Pawlik in a text message: "[T]he smell is back with a vengeance."

24. In response, Ms. Pawlik said that there was a leak in the building that may be contributing to the odors.

25. On June 6, 2022, Ms. Ingram notified Ms. Pawlik and Rep. Davanzo that there was water coming through the District Office's floor.

26. On the same date, Ms. Ingram reported the flooding and odors in the office to Ms. Zaucha.

27. Ms. Ingram did not receive a response from Ms. Zaucha to that report.

28. On June 26, 2022, Ms. Ingram verbally complained again of the odors to Rep. Davanzo while attending a road-naming ceremony.

29. On July 7, 2022, Ms. Zaucha emailed Ms. Ingram to follow up on the "mold situation."

30. Ms. Ingram responded to that email by describing the continued presence of the odors for Ms. Zaucha.

31. Ms. Zaucha then forwarded Ms. Ingram's email to James Mann, HRC's Senior Deputy Chief Counsel.

32. In response, Mr. Mann advised Ms. Zaucha to purchase mold test kits to check the District Office for the presence of mold.

33. Ms. Zaucha reported Mr. Mann's directions to Ms. Ingram, calling them "good advice," and told Ms. Ingram that she would be reimbursed for purchasing the mold tests.

34. Pursuant to Ms. Zaucha's directive, Ms. Ingram purchased two Healthful Home mold tests and returned to the District Office on July 12, 2022, to utilize them.

35. While in the District Office, Ms. Ingram noticed what appeared to be mold growing inside the air vents.

36. After removing the vent covers, Ms. Ingram saw a significant amount of a mold-like substance, which she took pictures of in order to document the problem.

37. Ms. Ingram then used the mold tests, which came back positive for Aspergillus/Penicillium and Stachybotrys.

38. Both types of mold are linked to negative health impacts, including those experienced by Ms. Ingram, and created an unclean, unsafe, unsanitary, and unhealthy working environment.

39. Ms. Ingram's official duties did not include testing for mold and reporting on its presence, but she did as she was told by her superiors.

40. The District Office's landlord was responsible for maintaining the District Office, along with Ms. Zaucha, who oversaw the District Office's operations.

41. Ms. Ingram informed Rep. Davanzo of the mold test results when he arrived at the office on July 12, 2022, in order to protect herself, her colleagues, and Rep. Davanzo's constituents.

42. Upon learning of the positive mold tests, Rep. Davanzo angrily asked Ms. Ingram, "Who the fuck gave you permission to do this?"

43. That statement is direct evidence that Ms. Ingram's official duties did not include testing and reporting on the presence of mold.

44. In response, Ms. Ingram told Rep. Davanzo about Ms. Zaucha's emailed directive, which contained Mr. Mann's instructions.

45. Rep. Davanzo then claimed that he was not aware of the problem and accused Ms. Ingram of "opening a can of worms."

46. On July 13, 2022, Rep. Davanzo sent a profanity-laced email (attached as Exhibit B) to Mr. Smeltz, Mr. Gouker, Mr. Schaller, and Rep. Dunbar, in which he chastised Ms. Ingram for taking the mold tests, despite her following advice from the HRC's legal counsel.

47. In the email, Rep. Davanzo professed his ignorance of any staff complaints regarding health effects from the mold, inaccurately claiming, "Not once did my staff come to me and say Im [*sic*] feeling sick from working in this office, Hey I feel unsafe working here, not a word!"

48. Rep. Davanzo also expressed his frustration that there would not be an easy solution to the District Office's mold problem, making comments such as the following: "WTF is a mold expert?" and "There is no way we can send them back in there without fixing the problem but how do we fix it, Lisa and Nikki mentioned tearing the drywall off the walls! I am livid and just pissed off!"

49. Rep. Davanzo concluded the email with the following paragraph: "I am just pissed the fuck off, I do not wish to have Nikki Ingram work for me anymore and quite frankly I don't care if Lisa Zaucha joins her! This is just unacceptable! Now we are going to have to move offices? Show me one building from the 50s that doesn't have a trace of mold in it, what's next, The asbestos floor tile adhesive? ***It's not going to end, we've opened a can of worms! I will no longer work with these two, I will shut my office down first!***" (emphasis added).

50. Rep. Davanzo expressed no concern about the risk that the mold presented to his staff and constituents.

51. His concerns revolved around the hassle that came with dealing with the mold.

52. In no uncertain terms, Rep. Davanzo ordered Ms. Ingram's termination because she "opened a can of worms" through her whistleblowing and free speech.

53. Mr. Smeltz, Mr. Gouker, Mr. Schaller, and Rep. Dunbar were all aware of, and participated in, the adverse employment action that followed.

54. In a reply email, Mr. Smeltz assured Rep. Davanzo that his problem was "being addressed."

55. In the days after Ms. Ingram reported the positive mold tests, her working relationship with Rep. Davanzo soured.

56. Rep. Davanzo largely stopped talking to Ms. Ingram, removed her from staffing certain events, and ignored her emails.

57. On July 19, 2022, Ms. Ingram received a text message from Ms. Zaucha, requesting a meeting to discuss "what's been going on over there."

58. According to Ms. Zaucha, this meeting was being held at Rep. Davanzo's request.

59. Upon arriving at the District Office, Ms. Ingram met with Ms. Zaucha and Ms. McGhee.

60. Mr. Gouker, Ms. Mitchell, and Ms. Vecchio joined the meeting by phone.

61. Mr. Gouker started the meeting by informing Ms. Ingram that the HRC terminated her employment.

62. All Defendants present in this meeting were aware of, and participated in, the termination of Ms. Ingram.

63. Mr. Gouker claimed that Rep. Davanzo made the decision due to a "clash of personalities" and wanted to go in another direction.

64. In a subsequent termination letter, Mr. Gouker changed the basis for Ms. Ingram's termination by citing "issues previously discussed with you by Lisa Zaucha and Representative Davanzo."

65. It is apparent that the "issues" referenced by Mr. Gouker were Ms. Ingram's attempts to ensure that the District Office was safe for herself, her colleagues, and Rep. Davanzo's constituents.

66. In response to Ms. Ingram's unemployment compensation filing, the HRC reported to the Office of Unemployment Compensation that it fired Ms. Ingram for rule violations of its conduct/discipline and annual leave polices—its third different justification.

67. The HRC's shifting justifications are pretextual, used to cover the termination of a whistleblower.

68. When Ms. Ingram complained about the odors in the District Office and informed Rep. Davanzo of the positive mold tests, she engaged in whistleblowing by making good faith reports of wrongdoing.

69. By providing unclean, unsafe, unsanitary, and unhealthy working conditions through the presence of mold, the HRC engaged wrongdoing by violating the following:

- According to the General Safety Law and its regulations, "All establishments shall be so constructed, equipped, arranged, operated, and conducted as to provide reasonable and adequate protection for the life, limb, health, safety, and morals of all persons employed therein." 43 P.S. § 25-29(a).

- Ordinance No. 2019-2 of the Borough of West Newton adopted the 2015 International Property Maintenance Code ("IPMC"). The violations of the IPMC include, but are not limited to, the following:

    o "An unsafe structure is one that is found to be dangerous to the life, health, property or safety of the public or the *occupants* of the

8

structure by not providing minimum safeguards to protect or warn *occupants* in the event of fire, or because such structure contains unsafe equipment…" IPMC § 108.1.1. (emphasis in original).

- "Unsafe equipment includes any boiler, heating equipment, elevator, moving stairway, electrical wiring or device, flammable liquid containers or other equipment on the *premises* or within the structure which is in such disrepair or condition that such equipment is a hazard to life, health, property or safety of the public or *occupants* of the *premises* or structure. IPMC § 108.1.2. (emphasis in original).

- "A structure is unfit for human *occupancy* whenever the *code official* finds that such structure is unsafe, unlawful or, because of the degree to which the structure is in disrepair or lacks maintenance, is insanitary, vermin or rat infested, contains filth and contamination, or lacks *ventilation*, illumination, sanitary or heating facilities or other essential equipment required by this code, or because the location of the structure constitutes a hazard to the *occupants* of the structure or to the public." IPMC § 108.1.3. (emphasis in original).

- "A person shall not occupy as owner-occupant or permit another person to occupy *premises* that are not in a sanitary and safe condition and that do not comply with the requirements of this chapter." IPMC § 301.2. (emphasis in original).

- "*Exterior property* and *premises* shall be maintained in a clean, safe and sanitary condition." IPMC § 302.1. (emphasis in original).

- "The interior of a structure and equipment therein shall be maintained in good repair, structurally sound and in a sanitary condition. *Occupants* shall keep that part of the structure that they occupy or control in a clean and sanitary condition." IPMC § 305.1. (emphasis in original).

- "Interior surfaces, including windows and doors, shall be maintained in good, clean and sanitary condition…Cracked or loose plaster, decayed wood and other defective surface conditions shall be corrected." IPMC § 305.3. (emphasis in original).

- "The components of a structure and equipment therein shall be maintained in good repair, structurally sound and in a sanitary condition." IPMC § 306.1. (emphasis in original).

70. The Pennsylvania House of Representatives is governed by the Ethical and Professional Conduct Rules of the House of Representatives.

71. By requiring Ms. Ingram to perform mold tests which were unrelated to her official job duties, the HRC engaged in wrongdoing by violating the following rule in the Ethical and Professional Conduct Rules of the House of Representatives:

- "No house employee may be required to perform any task unrelated to the House employee's official duties, on House work time or the employee's own time, as a condition of employment or continued employment." Rule 2(E)(3)

72. Defendants' pretextual justifications for Ms. Ingram's termination are also cover for their retaliation against Ms. Ingram for exercising her free speech rights.

73. As a result of Defendants' illegal actions, Plaintiff has suffered economic and noneconomic damages.

## V.    CLAIMS FOR RELIEF

### COUNT I (all Defendants)

**VIOLATION OF FIRST AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION and 42 U.S.C § 1983**

74. Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

75. In reporting the presence of toxic mold, Plaintiff spoke as a citizen on a matter of public concern—constitutionally protected conduct.

76. Plaintiff then suffered an adverse employment action when Defendants terminated her employment.

77. As described, Rep. Davanzo's email is direct evidence of the causal link between Plaintiff's free speech and the adverse employment action taken by Defendants.

78. Accordingly, Defendants' violation of Plaintiff's First Amendment rights is established, which is actionable under 42 U.S.C § 1983.

79. Plaintiff has been directly harmed as a result of Defendants' violations as is fully set forth above.

## COUNT II – RETALIATION UNDER THE PENNSYLVANIA WHISTLEBLOWER LAW (all Defendants)

80. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs.

81. The individual Defendants, as state officers, meet the definition of a Public Body, as enumerated in 43 P.S. § 1422.

82. Because all Defendants are Public Bodies, they meet the definition of an Employer under Pennsylvania's Whistleblower Law.

83. In reporting the presence of toxic mold, Plaintiff may good faith reports of wrongdoing.

84. As described, Rep. Davanzo's email is direct evidence of the causal link between Plaintiff's whistleblowing and the adverse employment action taken by Defendants.

85. Accordingly, Defendants' violation of the Pennsylvania Whistleblower Law, 43 P.S. § 1423(a), is established.

86. Plaintiff has been directly harmed as a result of Defendants' violations as is fully set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a) Assume jurisdiction herein;

(b) Declare Defendants' conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c) Award Plaintiff wage loss damages, including back pay, front pay, and lost future earnings, damages associated with the increased tax burden of any award, and lost fringe and other benefits of employment;

(d) Award Plaintiff compensatory and punitive damages under 42 U.S.C § 1983;

(e) Award Plaintiff actual damages under the Whistleblower Law;

(f) Award Plaintiff pre- and post-judgment interest;

(g) Award Plaintiff costs and attorney's fees; and

(h) Grant such other relief as the Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Respectfully Submitted,

/s/ *Nicholas W. Kennedy*

Nicholas W. Kennedy
PA ID No. 317386

Quatrini Law Group
550 E. Pittsburgh St.
Greensburg, PA 15601